***********
Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to receive further evidence or to rehear the parties or their representatives, the Full Commission affirms and adopts the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties as:
 STIPULATIONS
1. All parties are properly before the North Carolina Industrial Commission and the North Carolina Industrial Commission has jurisdiction of the parties and of the subject matter.
2. All parties were correctly designated and there was no question as to misjoinder or nonjoinder of the parties.
3. Plaintiff worked for defendants from 28 July 1999 through 9 November 2000 as a personal care aide.
4. All of the medical records provided by plaintiff to defendants through the date of the hearing before the Deputy Commissioner were stipulated into evidence and submitted.
5. Pursuant to an Industrial Commission Form 22, it was determined that plaintiff's average weekly wage was $224.77, yielding a compensation rate of $149.85.
 *********** RULINGS ON EVIDENTIARY MATTERS
At the time of the hearing before the Deputy Commissioner, plaintiff attempted to hand up documents in addition to those previously agreed upon by the parties. Plaintiff also sent additional documents to the Deputy Commissioner as part of her contentions. At the time of the hearing before the Deputy Commissioner, and within written arguments submitted to the Deputy Commissioner, defendants objected to those documents being admitted into the record. The documents included hearsay and irrelevant information. The objections raised by defense counsel concerning those documents are valid and the documents were not admitted by the Deputy Commissioner into evidence of this claim.
 ***********
Based upon all the competent evidence of record, the Full Commissioner finds as fact and concludes as a matter of law the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was 43 years old. She had a high school education and had completed several courses at Nash/Edgecombe Community College, including computer courses as well as EMT courses. Plaintiff reported her job history as having worked at Peoples Bank between 1978 and 1983, at a Rocky Mount undergarment factory for five years, and at the YMCA from 1990 to 1997 as a customer service representative.
2. In 1997, plaintiff's mother became incapacitated and moved into plaintiff's home. Plaintiff lost her job with the YMCA and chose to stay home and care for her mother. She did so without remuneration until 1999 when she heard from a friend about the Community Alternatives Program. Under this program, provided both the patient and the proposed family member-caregiver were qualified, plaintiff could be paid for staying home and caring for her mother. In 1999, plaintiff applied to the program. Plaintiff's mother was found qualified to participate and plaintiff was found qualified to be paid for caring for her mother. Plaintiff was designated as a Personal Care Aide. At the time plaintiff applied to be paid for her services, she knew she had no nursing skills, was not a certified nursing assistant, and was not a registered nurse.
3. The Community Alternatives Program is governed by the Department of Social Services. A skilled nurse from the county health department assesses patients to determine if they are qualified for the program. The nurse from the county health department and a caseworker from Social Services determine the level of care that a patient needs. Interim Healthcare was a vendor that provided aide-level care only for the Community Alternatives Program. Interim Healthcare was limited to providing patients under this program with aide-level care and not skilled nursing care, which is required in order to administer medications. However, the program does not prohibit a family member from administering medications. Thus, in work hours during which plaintiff was being paid by the Community Alternatives Program, she could not give medications. As a family member, she could give those medications and was expected to give those medications in the role of a family member and not while working as an aide for Interim Healthcare.
4. Plaintiff cared for her mother while being paid by the Community Alternatives Program between August 1999 and 9 November 2000, when her mother died. During that period, plaintiff made weekly visits to the Interim Healthcare office, wherein she submitted weekly time sheets. The weekly time sheets provided plaintiff with an opportunity to note any problems, injuries, complications, etc. No problems were noted. In addition, according to Vicki Braddy, Area Director of Healthcare Services for Interim Healthcare, Interim Healthcare conducted weekly team conferences based on the information provided by plaintiff as well as information gathered by a supervisory registered nurse, to discuss the patient situation with respect to staffing.
5. Plaintiff's duties as a personal care aide included grooming and bathing her mother, cleaning and cooking for her mother, running errands, providing groceries, and assisting with the activities of daily living. Plaintiff's mother was the only patient plaintiff ever worked with through her employment with Interim Healthcare.
6. Plaintiff's mother was a diabetic, had chronic renal failure requiring dialysis three times a week, as well as hypertension, and coronary artery disease/cardiomegaly. Plaintiff testified that her mother's problems worsened in May 2000. At that time, plaintiff's mother began dialysis three times per week and was transported by a county van to her dialysis appointment. Although plaintiff testified that she occasionally followed the van to the dialysis center, for the most part the van would pick up her mother and deliver her back to plaintiff following the completion of the dialysis.
7. In June 2000, for the first time, plaintiff reported to her primary care physician, Dr. Reddix, that she felt stressed. At that time, Dr. Reddix rewrote plaintiff's prescription for hypertension. Dr. Reddix did not prescribe any medical treatment whatsoever for plaintiff's complaints of stress. In August 2000, plaintiff requested that Interim Healthcare provide assistance in caring for her mother. Interim provided 10 hours of care per week in the evenings by another personal care aide. Plaintiff continued to report 40 hours of care per week and continued to be paid for that amount of care.
8. On 9 November 2000, plaintiff's mother died. Plaintiff took her last time sheets to the Interim Healthcare office, reported her mother's passing, and the staff in the Interim Healthcare office, including Mary Demery, offered condolences. Ms. Demery was a client service representative for Interim Healthcare. Ms. Demery and the other client service representative in the office at that time offered to provide plaintiff another assignment with another patient when she felt capable of doing so. Ms. Demery testified that plaintiff stated she was going to wait for a while and would probably go back to school. Plaintiff declined any new clients.
9. In July 2000, plaintiff had a positive tuberculosis skin test. A chest x-ray was performed because of the positive test. It was determined that plaintiff did not have tuberculosis. Plaintiff's mother did not have tuberculosis.
10. During this claim, plaintiff questioned why she was allowed to remain in the home caring for her mother following the positive skin test. At the time the test was reported as being positive, the issue was discussed at Interim Healthcare and because plaintiff continued to live with her mother and would have continued to live with her mother, even had she not been the caregiver, she was left as the caregiver and paid for those services.
11. On 13 November 2000, four days after her mother's death, plaintiff was seen by Dr. Reddix, her family physician, at which time she was complaining of abdominal discomfort, chest pain, and stress. By that time, Dr. Reddix had diagnosed plaintiff with cardiomegaly, which was the same condition that her mother had. Dr. Reddix continued to treat plaintiff for hypertension and iron deficiency anemia. Her blood pressure was controlled by medication.
12. Thereafter, plaintiff was treated by various physicians for an ovarian cyst, headaches, dizziness, uterine fibroid tumors, cardiovascular disease with cardiomegaly, and hearing loss.
13. Plaintiff alleges that her job either caused or aggravated the above conditions, entitling her to workers' compensation benefits. Plaintiff testified that no doctor ever told her that her health problems were due her job.
14. Plaintiff testified that none of the physicians have ever determined that she was disabled from working by any of these conditions.
15. Further, no medical evidence was presented or admitted into evidence which states that any of plaintiff's medical conditions arose out of and in the course of her employment.
16. During plaintiff's employment with Interim Healthcare, Interim representatives reported that plaintiff had never reported any injury by accident. Marilyn Wall, Director of Human Resources at Interim Healthcare, testified that her first notice of any claim being filed by plaintiff was received in Fall 2001, eleven months after plaintiff had last worked for Interim Healthcare.
 ***********
Based upon the foregoing Stipulations and Findings of Fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Plaintiff did not sustain an injury by accident or specific traumatic incident to her body and/or back arising out of and in the course of her employment with defendants. N.C. Gen. Stat. §97-2(6).
2. Plaintiff has not sustained or contracted an occupational disease arising out of and in the course of her employment with defendants. N.C. Gen. Stat. § 97-53(13).
 ***********
Based upon the foregoing Stipulations, Findings of Fact, and Conclusions of Law, the Full Commission enters the following:
 ORDER
1. Under the law, plaintiff's claims must be and are hereby DENIED.
2. Each side shall bear its own costs.
This the ___ day of August, 2003.
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/_______________ DIANNE C. SELLERS COMMISSIONER
 S/____________ BUCK LATTIMORE CHAIRMAN